UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| OLD PESI, INC. and CONSTRUCTION MANAGEMENT SERVICES, INC., | ) ) ) | |
| Plaintiffs/Counterdefendants, | ) ) | |
| v. | ) ) | CASE NO. 1:07-cv-0635-DFH-TAB |
| STANLEY SECURITY SOLUTIONS, INC., | ) ) | |
| Defendant/Counterplaintiff. | ) | |

ENTRY ON COUNTER-DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
AND MOTION FOR SANCTIONS

This dispute arises out of a Purchase and Sale Agreement (the "Agreement")
between defendant-counterplaintiff Stanley Security Solutions, Inc. ("Stanley") and
Old Pesi, Inc., formerly known as Pinnacle Electronic Systems, Inc.,[1] and Old
Pesi's parent corporation, Construction Management Services, Inc. ("CMS"), the
plaintiffs and counterdefendants  in this action.  Before the asset sale, Old Pesi
was an electronics security and systems integration contractor.  It performed
much of its work in federal and state prison construction projects.  Stanley
designs and provides security hardware and systems, including technical support

---

[1]When the parties entered into the Agreement, Old Pesi's name was Pinnacle
Electronics Systems, Inc.  It changed its name to Old Pesi, Inc. following the asset
sale when Stanley began using the Pinnacle Electronics Systems name along with
the purchased assets.  For the sake of clarity, the court refers to "Old Pesi"
throughout this entry.

and service.  One of Stanley's subsidiaries, Stanley Integrator, was a competitor of Old Pesi.  Pursuant to the Agreement, dated September 30, 2005, Stanley purchased most of the assets of Old Pesi, including contracts for numerous construction projects in various stages of completion.

The Agreement called for a purchase price of $4,500,000.  Of that amount, $750,000 was placed in escrow as a reserve for any purchase price adjustments that might be required pursuant to Section 2.6 of the Agreement and to satisfy any claims for indemnity in excess of a $50,000 deductible.  Old Pesi and Stanley were to indemnify each other for certain of the warranties and representations made in the Agreement.  To the extent that either party believed it was entitled to indemnification under the Agreement, it was to provide prompt notice of the same, including a written estimate of damages incurred and a description of the method of calculating such damages.  Old Pesi and its parent CMS both agreed to stand behind Old Pesi's warranties and representations.

On July 5, 2006, counsel for Stanley sent a letter to Old Pesi and CMS notifying them that Stanley was making a claim for indemnification for uncollected accounts receivable, unpaid accounts payable, and losses that Stanley claimed to have suffered on eight of the incomplete construction projects.  The letter stated that Stanley's claim totaled $3,841,783.78 and was based on alleged inaccuracies in the representations and warranties made by Old Pesi in several sections of Article III of the Agreement.  On March 30, 2007, the date for distributing escrow

funds if no indemnity claim persisted, Stanley sent a second letter claiming another $350,000 in unpaid accounts payable and uncollected accounts receivable, plus undetermined damages from ten more of the construction projects.

Old Pesi and CMS responded to Stanley's claims letters by filing this lawsuit in May 2007. They contend that the claims for indemnity raised by Stanley are insufficient or barred, and they seek a declaratory judgment that they have not breached the contract and that Old Pesi is entitled to the escrow funds. They also assert fraud and a breach of contract by Stanley in connection with its post-sale representations and performance on a Pennsylvania prison construction project. Poor performance at that construction project resulted in the Commonwealth of Pennsylvania threatening to bar Old Pesi, CMS, and Stanley from further work on state construction projects. Old Pesi and CMS claim to have been damaged by the debarment threat. Stanley has filed a counterclaim in which it seeks to recover on the basis of the contractual indemnity claims it stated in its letters to plaintiffs.

Old Pesi and CMS have filed a motion for partial summary judgment on Stanley's counterclaim, to the extent it is based on recovery for losses associated with the construction projects and uncollected, unbilled retention monies. The motion does not seek summary judgment with respect to Stanley's claim of loss as a result of uncollected accounts receivable or unpaid accounts payable. Old Pesi and CMS have also filed a motion seeking Rule 11 sanctions against Stanley

on the theory that much of Stanley's counterclaim is based on frivolous factual and legal contentions.  As explained below, summary judgment is granted in part and denied in part, and the motion for sanctions is denied.

### Summary Judgment Standard

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law.  *Id.*  The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party.  *Id.* at 249.  When ruling on the motion, the court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor.  *Id.* at 255.  The moving party need not positively disprove the opponent's case.  The moving party must establish the lack of evidentiary support for the non-moving party's position.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

*Analysis*

Section 9.4 of the Agreement requires that it be construed in accordance with the laws of the State of Indiana.  Old Pesi and CMS make two sweeping legal arguments in support of their motion, and a third argument that asserts more specific deficiencies in the counterclaim as it applies to each of the eighteen identified construction projects.  The court examines first the broader issues and then turns to the more detailed questions.

I.      *Forecasts of Future Profitability*

Old Pesi and CMS contend that Stanley's counterclaim for losses at the various construction projects is based on Old Pesi forecasts of future profitability, which the Agreement specifically precludes as a basis for any claim.  Old Pesi and CMS contend that Stanley's schedule of damages is essentially the difference between its actual profitability and projections of profitability previously provided by Old Pesi as a part of the documentation that accompanied the Agreement. According to Old Pesi and CMS, as a matter of law Section 9.16 of the Agreement prohibits Stanley's reliance on projections of profitability in asserting a claim.

Section 9.16 of the Agreement provides as follows:

*Disclaimer of Projections.*  Neither Seller [Old Pesi] nor Parent Company [CMS] nor its officers, directors, employees, stockholders, Affiliates or representatives has made or makes any representation or warranty (other than those contained within Article III of this Agreement, if any) to Buyer

[Stanley] with regard to (a) any financial projection or forecast relating to Seller or (b) any information provided by Seller or Parent Company other than as part of this Agreement. With respect to any such projection or forecast delivered by or on behalf of Buyer or Parent Company to Buyer, Buyer hereby acknowledges that (i) there are uncertainties inherent in attempting to make such projections and forecasts, (ii) it is familiar with such uncertainties, (iii) it is taking full responsibility for making its own evaluation of the adequacy and accuracy of all such projections and forecasts so furnished to it and (iv) it shall have no claim against Buyer or Parent Company or any of their respective officers, directors, employees, stockholders, Affiliates or representatives with respect thereto.

In response, Stanley points out that it is asserting claims based upon representations made by Old Pesi in Article III of the Agreement, which representations are specifically excluded from the provisions of Section 9.16. Stanley's letters requesting indemnification and its counterclaim all specifically allege that Old Pesi breached the warranties made in various sections of Article III.  Stanley's damages summaries indicate that it is using Old Pesi profit projections to estimate its damages, it is not challenging the accuracy of Old Pesi's projections.  Rather, Stanley claims specific misrepresentations made by Old Pesi in Sections 3.12, 3.16, 3.18 and 3.22 of the Agreement.  Section 3.12 warranted the accuracy of financial statements and Section 3.16 the accuracy and collectibility of receivables.   Section 3.18 represented that no undisclosed liabilities existed other than those incurred in the normal course of business, and Section 3.22 warranted that the schedule of work in progress and information provided therein was accurate, complete, and without material discrepancies.

The Agreement clearly prohibits Stanley from basing a claim on the accuracy of the projections and forecasts provided by Old Pesi.  However, so long as Stanley's counterclaim is founded not on the accuracy of those projections but on the accuracy of warranties and representations made in Article III, its counterclaim is not barred by Section 9.16.  Whether the projections or forecasts can serve any evidentiary purpose with respect to determining damages, if a breach of the Section III warranties and representations is proven, is a question the court need not reach at this point.  In the end, Stanley may lack evidence sufficient to convince a jury that Old Pesi breached a warranty or that Stanley suffered damages as a result of such a breach, but nothing in Section 9.16 prohibits Stanley from asserting a counterclaim on the basis of a breach of Article III representations and warranties.

II.     *Unbilled Retention*

Old Pesi and CMS also seek summary judgment on a portion of Stanley's counterclaim on the theory that, as a matter of law, "unbilled retention" cannot be a recoverable account receivable under the Agreement.  Old Pesi and CMS claim that 85 percent of the unpaid accounts receivable claim made by Stanley, or approximately $855,000, amounts to unbilled retention, which is not a recoverable receivable.[2]  Old Pesi and CMS do not describe in their motion or brief

_____

[2]Construction contracts often call for a portion of progress payments to be deducted and held by the owner until completion of the contract.  This "retention" or "retainage" is defined in the project specifications or general conditions.  A (continued...)

how they calculated this percentage or which documents they are relying on. They simply state in their brief that Section 3.16 of the Agreement does not apply to claims for retention on the construction projects because retention amounts that had not yet been billed at the time of sale were not receivables at that time. The logic of the argument, that the retention amounts must have been billed before they could be called a recoverable receivable, is simple and persuasive.

In response, Stanley refers back to and traces the language used in the Agreement.  In Section 3.16 of the of the Agreement, Old Pesi and CMS warrant that except as set forth on Schedule 3.16, the "Receivables" reflected in the closing statements will be accurate and collectible within 180 days of closing.  Schedule 3.16 is blank, leaving no exceptions.  In that portion of the Agreement which sets forth the definitions of various terms, "Receivables" is defined as having "the meaning ascribed thereto in Section 2.1(f)."  Section 2.1(f) is entitled "Accounts Receivable" and reads as follows:

> All (a) trade accounts receivable and the other rights to payment from customers of Seller and the full benefit of all security for such accounts or rights to payment, including, all trade accounts receivable representing amounts receivable in respect to goods shipped or products sold or services rendered to customers of Seller; (b) all other accounts or notes receivable of Seller and the full benefit of all security for such accounts or notes; and (c) any claim, remedy or other right related to any of the foregoing; arising out of or related to the operation thereof through the Closing Date, including,

---

[2](...continued)
typical retention might  be 10% of all progress payments or of the contract as a whole.   Retaining a percentage of payments provides an incentive for the contractor to complete all final details of the project to collect all contract amounts held back.  See, *e.g.*, 4 Am. Jur. Legal Forms 2d § 47:43.

but not limited to the notes, accounts receivable, etc. identified on <u>Schedule 2.1(f)</u> hereto (the "Receivables");

Schedule 2.1(f) contains seven pages of computer generated Old Pesi accounting information.  At the top of the first page is a handwritten title notation of "Pinnacle Open Balance AR."  The first six pages all appear to document items that would fall into that category.  The final page has a handwritten title as well: "Pinnacle Open Balance Retainage AR."  The data on that last page is categorized by job number and project name and is provided in columns that are headed as follows:  (a) Contract Amount; (b) Billing to Date; (c) %; (d) Retention; and, (e) Last Retention Billing Date.  Seven of the jobs are listed as being 100% billed, and six of those jobs have dates listed under the "Last Retention Billing Date" column. The other thirteen projects listed have no entries under that column.

Stanley argues that all seven pages of Schedule 2.1(f) are receivables that Old Pesi warranted were accurate and collectible within 180 days of closing.  Old Pesi and CMS counter that Section 2.1(f) does not say that everything listed on Schedule 2.1(f) is a "Receivable," and if the information on the schedule confirms that there has been no billing for retention on a job, then it cannot be a "receivable" until it is billed.  They contend that it would be absurd to interpret the Agreement as containing an accounts receivable warranty that applies to retention amounts that have yet to be billed on construction contracts that have yet to be completed.  The warranty by the seller in Section 3.16 was that a receivable was "subject to no liens, security interests, setoffs or counterclaims . . . and will be

collectible within one hundred eight[y] (180) days from Closing at their recorded amounts."   For unbilled retention amounts for construction contracts that remained in progress, that warranty would be absurd.  The very purpose of the retention amounts was for buyers/owners of Old Pesi's services to be able to assert setoffs or counterclaims against them.  And as the seller, Old Pesi could not possibly warranty when the new owner of the business would actually complete the work, let alone bill and ultimately collect on those retention amounts.

The choice to use the abbreviated term for *et cetera*, "etc.", to describe "Receivables" in Section 2.1(f) was an unfortunate shortcut that has left room for Stanley to argue that everything attached as a part of Schedule 2.1(f) was a receivable account.[3]  However, a court should not interpret a contract so literally as to cause an absurdity in its application.  *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 859-60 (7th Cir. 2002), citing *USA Life One Ins. Co. Of Indiana v. Nuckolls*, 682 N.E.2d 534, 539 (Ind. 1977).  If the Agreement were interpreted as containing a receivables warranty on amounts that had yet to be billed, the result would be, in the words of Judge Posner, "too nutty" to be a tolerable interpretation.  See *Level 3 Communications, Inc. v. Federal Ins. Co.*, 168 F.3d 956, 959 (7th Cir. 1999).

---

[3]Even the *Chicago Manual of Style* recognizes the problems inherent in the use of a term like "etc." in a writing, as exemplified in its inclusion of the term in its "Glossary of Troublesome Expressions."  The term implies that a list of things is too exhaustive to recite, but it is often just tacked on when a writer runs out of things to say.  Chicago Manual of Style § 5.202 (15th ed. 2003).

On the record now before the court, it is unclear how much "retention" on each project had been billed prior to the asset sale and therefore constituted recoverable receivables under the Agreement.  However, it is clear that not all that was listed on the last page of Schedule 2.1(f) was a receivable that Stanley could expect to collect within 180 days of closing.  Accordingly, while Old Pesi and CMS are not entitled to a summary judgment finding that everything listed on the last page of Schedule 2.1(f) is "unbilled retention" and hence not subject to the receivables warranties, they are entitled to a ruling on the legal issue.  Under the terms of this contract, as a matter of law, retention amounts that had yet to be billed at the time of the asset sale were not subject to the receivables warranties contained in Section 3.16.

III.   *Stanley's General Defenses to Summary Judgment*

Stanley has raised several procedural defenses in response to the partial summary judgment motion.  First, Stanley claims that the Statement of Material Facts contained in Old Pesi's and CMS's  brief failed to comply with Local Rule 56.1 because it contained arguments, allegations, and facts that were not material.  The brief filed by Old Pesi and CMS may not be a model for compliance with the Local Rule 56.1, but it is no worse than most and not nearly so far beyond the pale that it warrants being stricken, as requested by Stanley.

And as a caution against written sarcasm in at least some legal contexts, Stanley contends that the court should interpret the remark in the Old Pesi and CMS brief that "Stanley somehow had sufficient grounds to assert a claim of more than $3 million" as an admission that sufficient grounds exists for such a claim. That argument is tone deaf to context and has only wasted time.

Stanley offers another argument that is also too clever.  To support their argument based on Section 9.16 and the exclusion of claims based on profitability projections, Old Pesi and CMS attached Stanley's interrogatory answers explaining its counterclaim, which attached and incorporated Stanley's notice of claim letters.  Stanley argues that Old Pesi and CMS, by offering Stanley's interrogatory answers and its letters into evidence, have put the evidence into the record that should require the court to deny summary judgment.  The argument lacks merit. Old Pesi and CMS may certainly rely on a statement made by Stanley in a discovery response or letter without admitting the truth or accuracy of the entire document.

Stanley also attacks the admissibility of the deposition testimony of Robert Durham and Robert Betty, claiming that these are former employees and principals of Old Pesi who stayed with the business for only a few months after the sale to Stanley and therefore have insufficient knowledge to provide admissible evidence on most relevant matters.  Durham and Betty may have given some deposition testimony that was not based on personal knowledge and would not be

admissible at trial, but they were required to answer questions they were asked even if their answers would not be admissible at trial.  That is no reason to disregard the entirety of their testimony.  Much of their testimony is clearly based on personal knowledge sufficient to be admissible at trial, including statements made with regard to facts in existence both before the sale and after.  While their credibility may be subject to challenge, the court rejects Stanley's blanket request that Durham's and Betty's testimony be stricken.

At the same time, the court must note that it is difficult to take seriously Old Pesi's repeated description of these two former key Old Pesi employees as "Stanley's own project managers," as though they spoke for Stanley in their depositions.  Durham and Betty each received $250,000 from Old Pesi as a result of the asset sale.  In partial consideration for those payments, each promised in writing not to assist anyone to assert any claim against Old Pesi.  They also left Stanley's employ voluntarily within months of the sale.  Their deposition testimony makes it clear that Durham and Betty were not acting as agents of Stanley in providing facts and offering their opinions of what went wrong on the various construction projects.  Their allegiance to Old Pesi is apparent.

IV.    *Arguments Specific to Particular Construction Projects*

Stanley alleges that Old Pesi and CMS are required to indemnify Stanley for Old Pesi's breaches of  Sections 3.12, 3.18 and 3.22 of the Agreement.  Stanley

claims that those breaches occurred when Old Pesi failed to account for known performance and project management errors on eighteen of the construction projects, leaving Stanley with previously undisclosed liabilities, a far greater amount of work necessary to complete the projects than represented at the time of sale, and assets worth significantly less than warranted.   The eighteen construction projects are identified as:

1.   Baltimore County Detention Center

2.   Centre County

3.   Douglas County

4.   Fairfax County Courthouse

5.   Faquier County Courthouse

6.   Franklin County

7.   Haywood County Courthouse

8.   MCI - W. Jessup

9.   Mecklenburg County Courthouse

10.   Mercer County Jail

11.   New Jersey Training School

12.   Northampton County Prison

13.   Prince William County Police Station

14.   SCI Albion

15.   SCI Houtzdale

16.   SCI Laural Highlands

17.   SCI Mercer

18.   USP Canaan Gates Locks

To prevail on its counterclaim with respect to these eighteen projects, Stanley must prove, as alleged, that Old Pesi misrepresented the pre-sale circumstances in a fashion that violated the warranties counterdefendants provided in one of the three sections of Article III.   That means Stanley must produce evidence of one of the following:

A.   Old Pesi was aware of pre-sale circumstances at a construction project that were so negative as to affect the accuracy of the financial statements provided to Stanley pursuant to Section 3.12 of the Agreement, resulting in Old Pesi and CMS being out of conformity with the warranty provided in that Section, that:

*Such financial statements fairly present the financial condition and the results of operations, changes in shareholders' equity and cash flows of Seller as at the respective dates of and for the periods referred to in such financial statements, all in accordance with GAAP.  The financial statements referred to in this Section 3.12 reflect and will reflect the consistent application of such accounting principles throughout the periods involved, except as disclosed in the notes to such financial statements.  The financial statements have been and will be prepared from and are in accordance with the accounting Records of Seller.*

B.   Old Pesi and/or CMS did not disclose a liability of Old Pesi that existed as a result of circumstances at a construction project, leaving them out of compliance with the warranty they provided in Section 3.18 that:

*Seller has no liability except for liabilities reflected or reserved against in the Financial Statements and current liabilities incurred in the ordinary course of business of Seller since the date of the Financial Statements.*

C.   Old Pesi and/or CMS was aware of circumstances at a construction project that caused the Work in Progress/Job Schedule reports,

provided as a part of Schedule 3.22, to be other than in compliance
with the warranty in Section 3.22 that:

*To Seller's knowledge, (i) the Work in Progress/Job Schedule reports,
dated June 30, 2005, and (ii) the Listing of work obtained between June
30, 2005 and Closing, (both of which are attached hereto as Schedule
3.22), are based on reasonable estimates made in good faith at the time
the reports were prepared.  To Seller's knowledge, Schedule 3.22 is
accurate, correct and complete and there are no current or past material
discrepancies with the data reported in such reports.*

Stanley has come forward with evidence that varies in quality and type.
With respect to the accuracy of financial statements, as warranted in Section 3.12,
Stanley's evidence misses the mark.  It has not identified a single representation
in the financial statements that it claims is inaccurate.  Instead it contends that
Durham's and Betty's admission in deposition testimony, that Old Pesi did not
include punch-list or warranty costs in its cost budgets for construction projects,
as Stanley does with its budgets, confirms that the cost budgets Old Pesi provided
were inaccurate.  In addition, Stanley contends that because Old Pesi did not pay
its employees overtime and travel pay, it was out of compliance with labor laws
and inaccurately computed its project budgets on the basis of such lower, non-
compliant labor costs.

Stanley's  evidence is inadequate for three reasons.  First, the only evidence
that Old Pesi was not in compliance with the relevant wage and hour laws is the
affidavit of a Stanley Human Resources employee who states that he discovered
that the exempt classifications used by Old Pesi for certain of its employees were
not appropriate.  Why Old Pesi's employee classifications were inappropriate or the

legal expertise possessed by the opining Stanley employee was not explained, leaving such affidavit testimony wholly inadequate to establish any actual violations of wage and hour laws.

Second,  just because Stanley categorizes punchlist and warranty costs in a certain manner for purposes of budgeting does not mean that Old Pesi and CMS have been deceptive or misrepresented the financial statements by not following the same practice.  Section 3.12 requires compliance with GAAP.  Stanley has not offered evidence that the alleged failure to budget such costs failed to comply with GAAP.

Finally, and perhaps most important, the record does not establish that a "cost budget" constitutes a "financial statement" as the term was used in Section 3.12.  Section 3.12 set forth the documents that were to be provided as financial statements.  It did not identify a "costs budget" as one of the financial statements to be provided.  Unfortunately, neither side has provided all the documentation that constituted the relevant schedules and attachments to the Agreement, making it more difficult for the court to reach a confident conclusion about the representations made by or to either side.

Stanley also claims that these cost budget failures and discrepancies, as well as misrepresentations with respect to the percentage of project completion, amounted to violations of the warranties provided in Section 3.22, which assured

the completeness and accuracy of the "Work in Progress/Job Schedule reports" identified as being submitted as a part of Schedule 3.22.  The one page "job schedule" report was submitted as Exhibit I to Old Pesi's and CMS's supporting brief.  That report has an effective date of September 30, 2005 and is the only record before the court of what constituted Schedule 3.22.[4]  In that document, Old Pesi and CMS made representations with respect to the costs, profits, and percentage of completion of each job.  That document, along with the testimony of Stanley employees who occupied or assumed management and construction oversight positions, provides Stanley with sufficient evidence to survive summary judgment with respect to the majority of the construction projects for which it claims that Old Pesi and CMS breached the warranties provided in Section 3.22.

Much of the evidence and argument submitted by both sides of this lawsuit had no relevance to the more narrowly defined dispute at hand.  The effort both sides put into identifying every pre-sale and post-sale management mistake, miscalculation, and assorted other peccadillos provided little help in resolving whether the progress and cost estimates were made reasonably and in good faith.

---

[4]Exhibit I, as submitted with the Old Pesi and CMS supporting brief, includes a "job schedule" report with an effective date of September 30, 2005, the closing date on the asset sale.  With that report is a cover e-mail which states that the report is a supplement to the "Closing Financial Statements."  However, it seems clear that it is more accurately a supplement to the "Work in Progress/ Job Schedule" reports referred to as being submitted as a part of Schedule 3.22.  It is not a document identified in Section 3.12 as a "Financial Statement" and does not provide the type of information described in that section or what one would expect to find in a typical  financial statement.  Accordingly, the court will treat Exhibit I as part of Schedule 3.22.  If there are more documents included in Schedule 3.22, they have not been identified by the parties.

Nor does a discussion of what was or was not done by Stanley as a part of its due diligence prior to the sale have any impact on the scope of the warranties made by Old Pesi and CMS in Article III of the Agreement. The warranties made in the Agreement, such as the one made in Section 3.22 assuring that the estimates contained in the Work in Progress/ Job Schedule reports provided at the time of sale were reasonably made and the information in those reports were accurate and complete, are clear, and the Agreement is fully integrated. In most instances there is evidence in the record to support each side's position for purposes of summary judgment with regard to whether Old Pesi and CMS lived up to the warranty in Section 3.22. The court turns to the more specific issues.

A.   *Baltimore County Detention Center, Centre County, Faquier County Courthouse, Fairfax County Courthouse, Haywood County Courthouse, Mecklenburg County Courthouse, Mercer County Jail, New Jersey Training School, Northhampton County Prison, Prince William County Police Station, SCI Albion, SCI Houtzdale, SCI Laural Highlands and USP Canaan Gates Locks*

Scott Dennison has been a project engineer and engineering manager with Stanley since 1997.  He was in charge of managing the integration of the assets of Old Pesi for Stanley, including the transitional oversight of the construction projects.  Chriss LaRue took over the Stanley field operations for the newly acquired construction business in June 2006, eight months after the sale.  Both Dennison and LaRue have submitted affidavits based upon their familiarity with the various construction projects, their review of project files and records provided at the time of sale, and Dennison's completion of what Stanley deemed "final reports" for eight of the construction projects.  William Allen is a Stanley employee who served as a project manager on the Fairfax County Courthouse.  He has provided an affidavit based on his familiarity with the Fairfax County Courthouse construction project.

Both Dennison and LaRue identify projects that they claim were clearly not near the completion level represented by Old Pesi in Schedule 3.22 (Baltimore County Detention Center, Centre County, Faquier County Courthouse, Haywood County Courthouse, Mecklenburg County Courthouse, Mercer County Jail, New Jersey Training School, Northhampton County Prison, Prince William County Police Station, SCI Albion, SCI Houtzdale and SCI Laural Highlands).  In addition,

Allen's affidavit identifies the Fairfax County Courthouse as having been misrepresented as more complete than it was at the time of the asset sale. The affiants point to various reasons why each of the projects fell short of the completion level set forth by Old Pesi in its job progress report. They testify to various unbudgeted costs, failures to recognize changes in conditions, and/or Old Pesi's disregard of egregious flaws in bid or project management that would have been known at the time of sale. The evidence for some projects is more plentiful than for others, but the court need not recite details of the evidence and arguments with respect to each of these projects. Suffice it to say that Dennison, LaRue, and Allen have provided at least a minimum level of admissible evidence to support Stanley's assertion that Old Pesi misrepresented the percentage of completion of each of these fourteen projects.

Old Pesi and CMS contend that the affidavits of Dennison, LaRue and Allen should be disregarded because they have no knowledge of what occurred before Stanley became responsible for the projects. According to Old Pesi and CMS, Robert Durham and Robert Betty offer the only reliable testimony because they were on hand both before and after the asset sale. Old Pesi and CMS also argue that Dennison's final reports contradict earlier reports prepared in April 2006 by Stanley's own Dan Wright, which, according to Old Pesi and CMS, show that the problems at the projects were the result of Stanley's own mismanagement. These arguments fail for several reasons, at least at the summary judgment stage.

First, Dennison, LaRue, and Allen have all testified that as a part of their responsibilities, they are familiar with and have reviewed and relied on project files that were kept by Old Pesi prior to being provided to Stanley following the asset sale. Such files would be admissible under Rule 803(6) of the Rules of Evidence as business records and could be relied on to the extent that these witnesses can qualify as experts who typically rely on the information contained in construction project files. See Fed. R. Evid. 703; *Baumholser v. Amax Coal Co.,* 630 F.2d 550, 553 (7th Cir. 1980). Nothing in the record gives this court cause to doubt that these witnesses had sufficient information to assess the progress of the projects and the level of accuracy of the representations made by Old Pesi in the job schedule report it submitted in support of the sale, at least as a matter of law.

Old Pesi's and CMS's assertion that the estimates of project completion made by Dennison, LaRue, and Allen are speculative because they were not on hand when the projects were run by Old Pesi is misguided. All of these witnesses give reasons for their conclusions. Perhaps the metaphor is too simple, but one does not need to have watched the original construction work to know that a house with floor joists but no floor is not yet complete. As far as Dennison's final reports are concerned, their credibility may be attacked by using the reports of Dan Wright, but that does not make Dennison's reports or his affidavit testimony inadmissible.

Another reason that the argument lacks merit is the misplaced insistence that the very general deposition testimony of Durham and Betty regarding the success of all the projects under Old Pesi supervision and the multitude of problems caused by Stanley's own transitional mistakes is enough to carry the day, as a matter of law, with respect to Stanleys' specific project warranty claims. Their testimony to the effect that Stanley failed to keep key personnel or that Stanley project management was unfamiliar with managing construction projects is far too general to be a basis for summary judgment with respect to claims specific to a particular project.  Durham and Betty may have the most inclusive knowledge with respect to many of the projects, and they may provide valuable and convincing testimony.   But for purposes of summary judgment, their testimony has been disputed, and their credibility may also be challenged based on their written and lucrative promises not to assist with any claim made against Old Pesi.

In the end, Old Pesi and CMS have considerable evidence to support their contention that Stanley was the cause of its own post-sale problems with respect to costs and project completion.  The due diligence documentation, the Wright reports, and the testimony of Durham and Betty serve as a heavy counterweight to the contrary evidence offered by Stanley.  Nevertheless, each side has advanced admissible evidence sufficient to support a finding in its favor.  A jury will need to

assess the conflicting evidence to answer all the material questions of fact with respect to the claims made on the fourteen above-noted projects.[5]

B.   *Franklin County*

The extent of the evidence submitted by Stanley to support its counterclaim with respect to the Franklin County project is too sparse, however, to allow the claim to survive summary judgment.  Only the affidavit of Chriss LaRue addresses this project.  He does not claim that it was not completed to the level represented by Old Pesi at the time of the asset sale.  He asserts that Old Pesi did not have the requisite technical skill set or personnel to create a special coding system necessary to implement the technological requirements of the job.  According to LaRue, Stanley incurred significant extra costs to complete the contract because Old Pesi had not properly estimated the amount of costs associated with obtaining the expertise necessary.

In contrast, Old Pesi and CMS point to the report done by Stanley's Dan Wright shortly after the asset sale indicating that the project was on schedule and within budget.  They also refer to the deposition testimony of Robert Durham to

---

[5]The Baltimore County Detention Center project is also subject to a claim by Stanley that, contrary to the warranty Old Pesi and CMS gave in Section 3.18 of the Agreement, a subcontractor's dispute and lawsuit seeking additional payment for  work on that project was a known liability that Old Pesi failed to report or acknowledge at the time of the asset sale.  That claim is supported by the affidavit of Chriss LaRue as well as the testimony of other Stanley and Old Pesi employees who worked on the project.  That claim survives summary judgment as well.

the effect that there was no sign of any problem with the Franklin County project at the time of the asset sale. According to the Old Pesi job schedule report, at the time of the asset sale very little had been completed on the project. LaRue's speculation that Old Pesi did not possess the necessary technical knowledge or personnel has no foundation in admissible evidence and cannot support the claim. Accordingly, Old Pesi and CMS are entitled to summary judgment on Stanley's claim with regard to the Franklin County project.

C.     *SCI Mercer*

Stanley's evidence of warranty breach with respect to the SCI Mercer project is also inadequate to sustain its claim. Again, only the affidavit of Chriss LaRue addresses this project. He claims that Stanley incurred extra labor costs because Old Pesi did not include sufficient money in its project budget to pay travel and overtime pay to employees that Stanley decided were entitled to such pay. In response, Old Pesi again relies on the report of Stanley's Dan Wright, which found the project to be on schedule and within budget in April 2006.

Nothing in the Agreement suggests that Old Pesi and CMS warranted the accuracy of their assessment of whether particular employees were entitled to overtime and travel pay. And, as pointed out earlier, no foundation has been laid to establish as a matter of law that overtime and travel pay were due any particular group of employees. Any budget deficiencies based on a difference of

opinion as to such pay entitlements would not reflect an unreasonable estimate on the part of Old Pesi, unless it could be demonstrated that the assessment was so far afield as to be irrational.  Stanley has provided no admissible evidence to that end, and LaRue's affidavit testimony is insufficient to avoid summary judgment on the claim based on the SCI Mercer project.

D.      *Douglas County and MCI W. Jessup*

Again, Stanley relies only on the LaRue affidavit to assert its claims with regard to these last two projects.  LaRue does not contest that the projects were complete or on the verge of being complete.  Instead, LaRue claims that the software licenses had yet to be paid for and provided to the project owners.  In addition, LaRue claims that the final billing submitted by Old Pesi for the MCI W. Jessup project, which included retention, has been an uncollected receivable as a result of pre-sale issues that were created by Old Pesi.

The fact that Old Pesi had yet to provide the owners with software licenses, at a relatively minor expense (Douglas = $5,888 and MCI W. Jessup = $21,460), does not affect the good faith or reasonableness of Old Pesi's job progress report as submitted at the time of Stanley's purchase of the assets.  Unlike his more detailed statements with respect to representations of completeness or unaccounted for costs at other projects, LaRue has pointed to no particular

representation made by Old Pesi with respect to these projects that could be questioned as unreasonable or made in bad faith.

On the other hand, to the extent that Stanley's  MCI W. Jessup claim is for uncollected receivables related to the final project billing and is a part of its broader claim for uncollected receivables of all sorts, it survives summary judgment.  In fact, in their partial summary judgment motion, Old Pesi and CMS seek  judgment only with respect to that part of Stanley's uncollected receivables claim which constitutes a claim for unbilled retention.  The court discussed that issue above and found for Old Pesi and Stanley.

V.      *Motion for Sanctions*

Based on the discussion of the partial summary judgment motion filed by Old Pesi and CMS, their motion for sanctions is denied.  "[A] court may impose sanctions on a party for making arguments or filing claims that are frivolous, legally unreasonable, without factual foundation, or asserted for an improper purpose." *Fries v. Helsper*, 146 F.3d 452, 458 (7th Cir. 1998).  Old Pesi and CMS claim that Stanley's counterclaims with respect to the eighteen individual construction projects are frivolous.  They make the same arguments they made in support of their partial summary judgment motion, relying primarily on their argument that the construction project claims are based on Old Pesi profit projections that cannot form the basis for a claim.   The court rejects that

argument and the others for the same reasons stated above. The four project-related counterclaims which the court determined do not survive the partial summary judgment motion were not legally unreasonable or sufficiently superfluous to warrant sanctions.

*Conclusion*

For the reasons discussed above, Old Pesi's and CMS's Motion for Partial Summary Judgment (Doc. No. 31) is GRANTED IN PART and DENIED IN PART. Summary judgment is granted in favor of Old Pesi and CMS with respect to Stanley's claim for indemnity under the Agreement for uncollected receivables to the extent that they constitute unbilled retention. Summary judgment shall also be entered in favor of Old Pesi and CMS with respect to Stanley's claim for indemnity under the Agreement for damages associated with a breach of warranties related to the individual construction projects known as Franklin County, SCI Mercer, Douglas County and MCI W. Jessup. The motion is denied in all other respects. In addition, Old Pesi and CMS's Motion for Sanctions (Doc. No. 34) is DENIED.

So ordered.

Date: June 27, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Michael J. Lavoie
BUTZEL LONG, P.C.
lavoie@butzel.com

John Joseph Morse
MORSE FOUSHEE PC
morse@mflawpc.com

Thomas D. Noonan
BUTZEL LONG, P.C.
noonan@butzel.com

Craig R. Patterson
BECKMAN LAWSON, LLP
crp@beckmanlawson.com